UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DOUGLAS PEDDER,

        Plaintiff,

vs.

PAR STERILE PRODUCTS, LLC,

        Defendant.
_____/

Civil Action No.
19-cv-12704

HON. MARK A. GOLDSMITH

## OPINION & ORDER
## GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Dkt. 43)

This lawsuit arises out of Defendant Par Sterile Products, LLC's termination of Plaintiff Douglas Pedder's employment. Pedder alleges that the termination constituted gender discrimination in violation of the Elliott-Larsen Civil Rights Act (ELCRA) and also constituted a breach of contract. This matter is now before the Court on Par's motion for summary judgment on both claims (Dkt. 43). For the reasons that follow, the Court grants Par's motion.

### I. BACKGROUND

Pedder was previously employed by Par as an electrician. Pedder Dep. at 25 (Dkt. 43-2). Pedder's electrician job classification was part of a bargaining unit represented by the United Steelworkers, Local No. 176; consequently, the terms and conditions of Pedder's employment were governed by collective bargaining agreements (CBAs) negotiated through this union. Braddock Decl. ¶ 5 (Dkt. 43-3).[1]

During his employment with Par, Pedder was aware that Par had a workplace harassment policy, which prohibits, among other things, "[o]ffensive sexual remarks" and "[o]ffensive

---

[1] As relevant here, one CBA was effective from January 24, 2006 to February 28, 2008, Ex. B to Braddock Decl. at PageID.537–610 (Dkt. 43-3), and one was effective from March 1, 2015 to February 28, 2018, Ex. A to Braddock Decl. at PageID.439–536.

1

physical conduct, including touching and gestures." Workplace Harassment Policy (Dkt. 43-11); Pedder Dep. at 39–40. Nevertheless, Pedder allegedly engaged in several instances of inappropriate sexual conduct and comments as a Par employee. The first alleged act occurred on November 13, 2003 and involved inappropriate comments made by Pedder to a female cafeteria worker.[2] Pedder received a three-day suspension for this act and was warned, "If you are guilty of any more such conduct in the future, you will be subject to severe disciplinary action, up to and including termination of your employment." Three-Day Suspension Notice at PageID.616. Pedder admits that he received a three-day suspension but denies that he was guilty of the alleged misconduct. Resp. to Statement of Material Facts ("SOMF") at ¶ 6 (citing Pedder Dep. at 29–30).

On January 24, 2006, Pedder was accused of engaging in inappropriate conduct once again, this time for an incident that involved Pedder following a female coworker up a flight of stairs and lifting up her lab coat. Pedder Dep. at 36. Pedder admits that he was accused of committing this act but denies that it actually happened. Id. at 36–37. According to Par, it planned to terminate Pedder for this incident; however, after Pedder's union intervened, "it was agreed that Plaintiff would receive a 14-day suspension and enter into a 'Non-Precedential Disciplinary Settlement/Last Chance Agreement [(LCA)].'" SOMF ¶ 10 (citing LCA (Dkt. 43-5)). Pedder denies that his union had any involvement in the negotiation or creation of the LCA. Resp. to SOMF ¶ 10.

Pursuant to the LCA, Pedder received a two-week suspension and was required to seek counseling. LCA at PageID.618. He also agreed that he would be subject to discharge at the discretion of Par for any future "inappropriate sexually related conduct or language offensive to

---

[2] The three-day suspension notice states that Pedder's "[w]ords and actions . . . were offensive to a female . . ."; however, the notice does not specify Pedder's exact comments. See Three-Day Suspension Notice (Dkt. 43-4). Pedder's deposition testimony also does not specify the exact words that he spoke to the cafeteria work. Rather, Pedder only testified that he "said something" and the cafeteria worker "took it the wrong way." Pedder Dep. at 30.

another individual . . . ." Id. The LCA permitted Pedder to "grieve" the issue of whether he committed the misconduct—presumably by following the grievance procedures set forth by the CBA. Id.

This was not the last time that Pedder was accused of inappropriate behavior. On September 16, 2016, Par learned that Pedder had allegedly repeatedly stared and made comments about a female worker's appearance. Investigation Report (Dkt. 43-9); Braddock Dep. 39–41 (43-7). Specifically, Pedder allegedly told a woman who was working in his area that he "didn't know that [he] would be working with someone that was so pretty." Investigation Report at PageID.707. Pedder kept staring at the woman, so she turned around to leave. At that point, Pedder allegedly told the woman that she "didn't have to leave, and that [she] could stay there with him so that he could look at [her]." Id. The woman left the area and returned 30 to 45 minutes later. Id. When she returned, Pedder allegedly told her, "You're so pretty so just stay and work here," and he continued to stare at her. Id.

A security officer saw the woman leaving the worksite and noticed that she was visibly upset. Id. When the security officer asked the woman about her visible state, she told him that she had a couple of uncomfortable encounters with Pedder and so she was leaving the facility. Id. The security officer reported the incident to Par's human resources manager. Id. Par's human resources manager conducted an investigation into the incident, interviewing the security officer, the woman, and Pedder. Based on this investigation, the human resources manager determined that the woman's harassment allegations "ha[d] merit and were also substantiated by Doug Pedder's own testimony." Id. at PageID.708.

Pedder admits that he told the woman that she looked "pretty," but denies staring at her and telling her to stay so that he could look at her. Resp. to SOMF ¶¶ 15–16 (citing Pedder Dep. at 48–49). Although Pedder presently denies the full extent of his alleged actions, he

3

acknowledged, shortly after the incident, that he had acted inappropriately. Pedder wrote a letter to Par's then-general manager, stating, among other things, "I understand I was wrong." Letter and Email (Dkt. 43-10). He also sent the general manager an email apologizing for his actions. Id.

Pedder was fired for violating Par's sexual harassment policy and the LCA. Braddock Dep. at 13–14. Pedder's local labor union challenged his termination by filing a grievance under the collective bargaining agreement. Pedder Dep. at 56–57. Par denied the grievance, and Pedder's international union representative declined to approve it for arbitration. Id. This lawsuit followed.

## II. STANDARD OF DECISION

A motion for summary judgment under Federal Rule of Civil Procedure 56 shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The moving party may discharge its burden by showing "that there is an absence of evidence to support the nonmoving party's case." Horton v. Potter, 369 F.3d 906, 909 (6th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

## III. ANALYSIS

Par argues that it is entitled to summary judgment on both the ELCRA claim and the breach of contract claim against it. The Court addresses each claim in turn.

A. ELCRA

Par argues that Pedder's ELCRA claim fails because: (i) Pedder has no direct or circumstantial evidence of gender discrimination, thus failing to make out a prima facie case of gender discrimination; and (ii) Par had nondiscriminatory and non-pretextual reasons for firing Pedder. Because Par is correct regarding its first argument, the Court need not address the second one.

Gender-based discrimination claims brought pursuant to the ELCRA "may be established by either proffering direct evidence of discrimination, or relying on circumstantial evidence to create an inference of discrimination." Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp., 176 F.3d 921, 926 (6th Cir. 1999). If the plaintiff relies on direct evidence, he must present "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." Id. "Direct evidence is evidence that proves the existence of a fact without requiring any inferences," which is essentially "evidence from the lips of the defendant proclaiming his or her . . . animus." Diebel v. L&H Resources, LLC, 492 F. App'x 523, 526 (6th Cir. 2012) (punctuation modified, citation omitted). Pedder does not present any direct evidence of gender discrimination; rather, Pedder relies on circumstantial evidence.

Because Pedder relies on circumstantial evidence, the McDonnell Douglas burden-shifting framework applies. Harrison v. Olde Fin. Corp., 572 N.W.2d 679, 681 (Mich. Ct. App. 1997) (referencing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). Under this framework, the burden of production initially rests with the plaintiff. To establish a rebuttable prima facie case of gender discrimination, the plaintiff must show that (i) he is a member of a protected class, (ii) he was subjected to an adverse employment action, (iii) he was qualified, and

5

(iv) he was treated differently than similarly-situated female employees for the same or similar conduct. Jacklyn, 176 F.3d at 928.³ If the plaintiff makes such a showing, the burden will then shift to the defendant to proffer a non-discriminatory reason for the action. McDonnell, 411 U.S. at 802. If the defendant satisfies its burden, the burden then shifts back to the plaintiff to show that the proffered reason was a pretext for discriminatory conduct. Harrison, 572 N.W.2d at 682. Although the burden shifts between the parties under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Texas Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 253 (1981).

Here, Par contends that Pedder cannot satisfy the fourth element—disparate treatment. Mot. for Summ. J. (MSJ) at 12–13 (Dkt. 43). Specifically, Par contends that Pedder has failed to identify a similarly situated female employee who was treated more favorably. Id. Because Par has pointed to an absence of evidence to support a necessary element of Pedder's case, Par is entitled to summary judgment unless Pedder can point to evidence that supports this element. See Horton, 369 F.3d at 909. As discussed below, Pedder fails to do so.

Pedder points to two items in the record in an attempt to substantiate his claim that he was treated differently than similarly situated female employees for the same or similar conduct: his own deposition testimony and that of Mark Stewart, a union vice president at the time of Pedder's discharge. Resp. at 12–13. Neither substantiates his claim.

---

³ The Court notes that Pedder argues, in a terse manner, that there are "other ways" to show gender discrimination than pointing to differential treatment of similarly situated individuals. Resp. at 12 (Dkt. 47). Because Pedder offers no authority to support this argument, the Court will not consider it further. See Rayyan v. Sharpe, No. 1:08-cv-324, 2008 WL 4601427, at *7 (W.D. Mich. Oct. 15, 2008) ("It is not the court's job to conduct research, marshal evidence, or make a party's arguments for him.").

As for Pedder's testimony, much of it consists of his subjective opinions and beliefs, such as his belief that "the male is guilty until you can prove yourself innocent" whereas "[w]omen are innocent until you prove them guilty." Pedder Dep. at 62. Such subjective opinions and beliefs are insufficient to create a genuine issue of material fact on the disparate treatment element of his prima facie gender discrimination case. See Arendale v. City of Memphis, 519 F.3d 587, 605 (6th Cir. 2008) (holding that a plaintiff's use of his "own subjective opinion to justify his allegations that the [defendant] discriminated against him" was "not sufficient to survive any motion for summary judgment").

Pedder also testified that he believed that his gender was the reason for his discharge because he knew of "incidents that happened with some women in the plant that were never even terminated or even disciplined" and he "witnessed females that said things and did things that were not even looked at even with supervisors around." Pedder Dep. at 62–63. However, Pedder could only recall one such specific instance—around 2009 or 2010—where he overheard "two women [who] were talking about their [sexual] exploits outside of work." Id. at 64. And that incident does not show that he was treated differently than similarly situated female employees for the same or similar conduct, for several reasons.

First, Pedder's testimony does not establish that the women were engaging in the same or substantially similar conduct that led to Pedder's discharge. Pedder was fired for violating the LCA, which prohibited Pedder from engaging in "inappropriate sexually related conduct or language that is offensive to another individual," and the workplace harassment policy, which prohibited Pedder from making "[o]ffensive sexual remarks" or engaging in "[o]ffensive physical conduct." Braddock Dep. at 13–14. Thus, Pedder must show that the women's remarks were offensive to one of the conversation participants in order to establish that their remarks were the same or similar to Pedder's remarks. However, Pedder's testimony does not establish that the

7

women's conversation was perceived as offensive by either conversation participant. The fact that female coworkers may have had an unoffensive, consensual conversation is of no moment.

Second, Pedder has not shown that the women were similarly situated to him. To show that he was treated differently than similarly situated females for the same or similar conduct, Pedder must show that "all relevant aspects" of his employment situation were "nearly identical" to those of the alleged similarly situated female employees. Humenny v. Genex Corp., 390 F.3d 901, 906 (6th Cir. 2004) (punctuation modified). This means that the individuals to whom Pedder compares himself must have been "subject to the same standards" and "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Id. (punctuation modified). Pedder has not shown that the women were, like him, previously disciplined for sexual harassment incidents and subject to an agreement with the same or similar provisions as the LCA that governed Pedder's conduct.

Even if Pedder had shown that the women were otherwise similarly situated to him, there is an obvious differentiating circumstance that distinguishes Par's treatment of the women. Specifically, Pedder's incident was reported to Par, but there is no evidence that anyone reported the women's conversation to Par. To the contrary, there is evidence to affirmatively support that Par did not know about the women's conversation. For instance, in his deposition, Pedder acknowledged that he did not report this alleged conversation to Par, Pedder Dep. at 65–66, even though the workplace harassment policy—which prohibits offensive sexual remarks—requires employees to report any suspected violation of the policy, Workplace Harassment Policy at

PageID.714–715.[4] Because Par did not know about the women's conversation, it cannot be said that Par intentionally treated the women differently than Pedder.

Stewart's testimony does not save Pedder's gender discrimination claim. In the portion of Stewart's testimony that Pedder points to, Stewart testified that, in his view, the #MeToo movement caused Par to "react a little more strongly than they might have." Stewart Dep. at 35–36. This, however, says nothing about differential treatment of similarly situated female employees. Rather, it is Stewart's subjective belief, which is insufficient to support the disparate treatment element of Pedder's prima facie case of gender discrimination. See Arendale, 519 F.3d at 605.

Because Pedder has failed to substantiate his claim that Par treated him differently than similarly situated females, Pedder cannot make out a prima facie case of gender discrimination. Accordingly, Par is entitled to summary judgment on this claim.

### B. Breach of Contract

Pedder alleges that he did not engage in sexually related conduct or language and, thus, Par breached the LCA by firing Pedder for engaging in such conduct and language. Am. Compl. at ¶ 28. Par argues that Pedder's breach of contract claim fails for two reasons: (i) the claim is preempted by § 301 of the Labor Management Relations Act (LMRA); and (ii) even if the claim is not preempted, Pedder admitted to making comments about his female coworker's appearance, which is a valid reason for termination under the LCA. Because Pedder's claim is preempted by

---

[4] It is unlikely that anyone other than Pedder would have even been able to report the women's conversation, given that Pedder testified that he was not positive that anyone else witnessed the incident, Pedder Dep. at 65. Stewart's testimony provides additional confirmation that no one reported the incident. He testified that he could not recall a single incident of a male complaining of sexual harassment perpetrated by a female throughout the time that he worked for Par and its predecessors—a period of approximately 20 years. Stewart Dep. at 7, 21–22 (Dkt. 43-8).

§ 301, the Court need not address Par's argument that it had a valid reason to discharge Pedder under the LCA.

Where a federal statute preempts a state law, the Constitution's Supremacy Clause requires courts to follow the federal law. U.S. CONST. art. 6, cl. 2. Preemption may be either expressed or implied. Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 98 (1992). Preemption under § 301 is implied because the section does not expressly preempt any state law claim but, rather, states that "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 29 U.S.C. § 185(a). "The pre-emptive force of § 301 is so powerful as to displace entirely any state cause of action for violation of contracts between an employer and a labor organization." Caterpillar Inc. v. Williams, 482 U.S. 386, 394 (1987) (punctuation modified, citation omitted). The Sixth Circuit utilizes a two-part test to determine whether a state law claim is independent of an action under § 301:

> First, the district court must examine whether proof of the state law claim requires interpretation of the collective bargaining agreement terms . . . . Second, the court must ascertain whether the right claimed by the plaintiff is created by the collective bargaining agreement or by state law. If the right both is borne of state law and does not invoke contract interpretation, then there is no pre-emption. However, if neither or only one criterion is satisfied, section 301 pre-emption is warranted.

DeCoe v. General Motors Corp., 32 F.3d 212, 216 (6th Cir. 1994). Where a purported state law claim for breach of a labor contract is preempted by § 301, the claim is transformed into a "hybrid" § 301 claim. Jones v. General Motors Corp., 939 F.2d 380, 384 (6th Cir. 1991). A hybrid § 301 suit is one involving claims against the employer for breach of a collective bargaining agreement and against the union for breach of the duty of fair representation. Id.

Underlying the first part of the two-step preemption inquiry is an acknowledgement that not every dispute concerning employment contracts gives rise to preemption concerns under § 301.

See Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 211–212 (1985) ("Section 301 on its face says nothing about the substance of what private parties may agree to in a labor contract. Nor is there any suggestion that Congress, in adopting § 301, wished to give the substantive provisions of private agreements the force of federal law, ousting any inconsistent state regulation."). At the same time, the Sixth Circuit has "not applied a cramped and narrow construction of the dictates of . . . Allis-Chalmers," nor has it "limited § 301 pre-emption to cases where the precise meaning of precise words in the CBA is the crux of the state-based claim." Jones, 939 F.2d at 383. Rather, the Sixth Circuit has "found many state-based claims pre-empted because they have implicated the federal policies underlying federal labor law":

> [W]e have stated that § 301 pre-empts state law when "employment relationships which are subject to a collective bargaining agreement" are implicated, Mashund v. Earl C. Smith, Inc., 795 F.2d 589, 591 (6th Cir. 1986), or when "the rights to be vindicated and the relationship between the parties are created not by state law, but by the collective agreement itself," Terwilliger v. Greyhound Lines, Inc., 882 F.2d 1033 (6th Cir. 1989), cert. denied, 495 U.S. 946, 110 S. Ct. 2204, 109 L.Ed.2d 531 (1990), or when a state-based claim requires examining the practices and customs of a workplace whose conditions are governed by a CBA, Ulrich v. Goodyear Tire & Rubber Co., 884 F.2d 936 (6th Cir. 1989), or when "employees covered by a CBA . . . rely upon the existence of a separate, individual employment contract giving rise to state law claims." Fox v. Parker Hannifin Corp., 914 F.2d 795 (6th Cir. 1990).

Id.

Consistent with the Sixth Circuit's broad reading of § 301 preemption, the Supreme Court has held that the word "contract" as used in § 301(a) encompasses documents beyond just the CBA itself. Retail Clerks Int'l Ass'n, Local Union Nos. 128 & 633 v. Lion Dry Goods, Inc., 369 U.S. 17, 25–26 (1962). In line with this holding, "lower courts have consistently declared . . . 'last chance agreements' . . . to be 'contracts' for section 301(a) purposes," Winters v. Ford Motor Co., No. 06-cv-10263, 2006 WL 3694611, at *3 (E.D. Mich. Dec. 12, 2006), because an LCA "is a negotiated agreement that supplements [a CBA]," Cotter v. DaimlerChrysler Corp., 87 F. Supp. 2d 746, 757 (E.D. Mich. 2000); see also Int'l Union of Operating Eng'rs Local 351 v. Cooper

11

Natural Res., Inc., 163 F.3d 916, 919 (5th Cir. 1999) (holding that "last chance agreements constitute formal contractual settlements of labor disputes" and, as they follow CBAs in time, should be construed as superseding collective bargaining agreements).

Pedder does not dispute that his breach of contract claim is premised on a theory that Par violated the terms of the LCA. Nor does he dispute that an LCA can constitute a "contract" as that term is used in § 301(a). However, Pedder argues that the LCA that he entered into with Par is not a "contract" within the meaning of the statute because his union was not a party to the agreement. In other words, Pedder argues that his claim is not preempted because the LCA is not a "contract[] between an employer and a labor organization . . . ." See 29 U.S.C. § 185(a).[5]

Par anticipated Pedder's argument in its motion and, accordingly, points to several items in the record to show that Pedder's union was involved in the negotiation or creation of the LCA. The first item is the union representative's signature on the second page of the LCA. The second is the portion of Pedder's testimony wherein he was asked whether Par was going to fire Pedder for the 2006 incident before his union got involved and worked out a way to save his job. Pedder answered, "Yeah. I mean anytime anything happened, I had a union representative, and the union was with me." Pedder Dep. at 36–37. Third is the testimony of Kenneth Hughes, the union's president, who testified that he disagreed with the statement that the LCA was "an agreement between the company and Mr. Pedder, not between the company and the union." Hughes Dep. at 16 (Dkt. 43-6). Fourth is the LCA's provision that if Pedder were to commit another instance of sexually inappropriate conduct or language, he could "grieve the issue of whether he committed

---

[5] In support of his argument that the LCA is an "individual employment contract" rather than a contract involving a labor organization, Pedder cites Caterpillar Inc. v. Williams, 482 U.S. 386 (1987). See Resp. at 18. That case is easily distinguishable. Caterpillar involved an individual employment contract that was entered into by the plaintiff-employee and defendant-employer before a collective bargaining agreement covering the employee was created. Id. at 396–397. Here, by contrast, the LCA was created after the CBA.

12

the misconduct." Id. at PageID.618. Par stresses that the CBAs set forth the grievance procedures for union-member employees, see Exs. A and B to Braddock Decl. at PageID. 453–458, 545–548, and Pedder indeed followed this procedure and followed a grievance after his discharge, see Pedder Dep. at 56–57.

Pedder argues that the union representative's signature does not attest to having been involved in the negotiation or creation of the LCA but, rather, merely attests that he was present during the signing of the LCA. Resp. at 16–17. Pedder also makes much of the fact that the union representative's signature appears on its own page—separate from the remainder of the document that was signed by Pedder and Par's representatives—arguing that "this page . . . with Alter's alleged signature, may have been added after-the-fact (and before this litigation) by Defendant to bolster its argument that the LCA was a management-union negotiated contract." Id. at 17. Pedder further argues that the LCA was meant to be entirely separate from the then-effective CBA because the LCA states that its terms are the "entire terms" of the agreement, and the LCA does not expressly reference the CBA. Id. at 20–21.

Although Pedder clearly disputes the union's involvement in the LCA, he has failed to show that the dispute about this fact is genuine. A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could find in favor of the nonmoving party. Anderson, 477 U.S. at 250. No reasonable jury could do so here.

The Court need not look beyond the express language of the LCA to illustrate this point. The LCA expressly describes the union as a party to the agreement. See LCA at PageID.618 ("The Company, the Union, and all other parties agree that this Settlement/Agreement is completely non-precedential . . . ."). This statement follows another that notes that the LCA is a "compromise intended to settle . . . this specific matter," id., which lends support to Par's position that it planned to terminate Pedder for the 2006 incident and only created the LCA after Pedder's union involved

13

itself in the situation, see SOMF ¶ 10. In addition, the statement on the first page of the LCA that "[a] Union Representative was present when this document was signed and received a copy" underscores the union's involvement rather than demonstrating non-involvement. Further, although the LCA does not expressly reference the then-effective CBA, it followed this CBA in time and, moreover, the LCA expressly references Pedder's right to grieve, which is a right begotten by the CBA.

Thus, even ignoring the second page—which Pedder alleges to have been added after-the-fact—it is clear from the face of the LCA that the union was involved in the negotiation or creation of the LCA. Pedder does not cite any record evidence in support of his argument that the second page was attached after-the-fact.[6] And, to the extent that Pedder argues that the union representative's signature was forged, this argument is undercut by Hughes's testimony that the signature indeed belonged to the union representative. Hughes Dep. at 15.[7]

The Court, therefore, concludes that the union was a party to the LCA. The Court also concludes that the first step of the two-part preemption inquiry is satisfied. This step asks whether resolution of Pedder's breach of contract claim requires interpretation of the LCA. The answer to this question is clearly "yes," as Pedder's claim is premised on the theory that Par breached the LCA by discharging Pedder for language and conduct that was not sexually related. See Winters, 2006 WL 3694611 at *4 ("Count I alleges a breach of the pertinent Union Agreement between the

---

[6] It appears that the only record evidence that might support his argument is Hughes's testimony that he agreed that it was "somewhat unusual" that there was a second page to the LCA. Hughes Dep. at 15. However, Hughes further testified that, while he "didn't know why this other page is on it by itself," it was clear to him that the first and second pages of the LCA "correlate with each other." Id. at 16. In addition, Hughes testified that the signature on the second page indeed belonged to the union representative. Id. at 15.

[7] Pursuant to Fed. R. Evid. 901(b)(2), a nonexpert can opine that handwriting is genuine based on his familiarity with it that was not required for the current litigation. When asked whether he had seen the union representative's signature before his deposition, Hughes answered, "Yes." Hughes Dep. at 15. Hughes was, therefore, familiar with this signature prior to the current litigation.

parties. Clearly, adjudication of this claim requires interpretation of . . . the Union Agreement itself.").

The second part of the preemption inquiry is likewise satisfied. This step asks whether the rights claimed by the plaintiff were created by the agreement or by state law. Pedder is claiming that Par did not have the ability to fire him under the terms of the LCA because Pedder did not engage in inappropriate sexually related conduct or language. Consequently, the right claimed by Pedder was created by the LCA, not state law. See Cotter, 87 F. Supp. 2d at 757 ("Plaintiff Cotter claims that DaimlerChrysler wrongfully discharged him without just cause in violation of his contract . . . . [T]he rights which Plaintiff seeks to vindicate arise solely under the terms of the collective bargaining agreement.").

As a result, § 301 preempts Pedder's breach of contract claim and, therefore, this claim must be interpreted as a hybrid § 301 claim. A hybrid § 301 claim has two elements: (i) the employer breached the agreement and (ii) his union breached its duty of fair representation. Jones, 939 F.2d at 384. A union-member plaintiff wishing to pursue a cause of action for breach of a union's duty of fair representation has the burden of showing that the union's action was "arbitrary, discriminatory, or in bad faith." Allen v. CSX Transp., Inc., 325 F.3d 768, 772 (6th Cir. 2003) (punctuation modified). Par argues that Pedder cannot establish the second element because "Plaintiff's Second Amended Complaint does not allege that Plaintiff's union breached its duty of fair representation." MSJ at 20. Although this argument sounds in Rule 12(b)(6) rather than Rule 56, see Winters, 2006 WL 3694611, at *5 ("Where a union-member plaintiff does not introduce factual allegations that the union breached its duty of fair representation, dismissal based on Rule 12(b)(6) is proper."), it stands to reason that if Pedder has failed to even allege that the union breached its duty of fair representation, then he has likely failed to produce any evidence to support

15

such a nonexistent allegation. Indeed, in response to Par's motion, Pedder fails to make any arguments or point to any evidence showing that the union breached its duty of fair representation.

Because Pedder cannot prove the second element of his hybrid § 301 claim, Par is entitled to summary judgment on this claim.

## IV.  CONCLUSION

For the foregoing reasons, the Court grants Par's motion for summary judgment (Dkt. 43).

SO ORDERED.

Dated: June 23, 2021  　　　　　　　　　　　　s/Mark A. Goldsmith  
　Detroit, Michigan  　　　　　　　　　　　　MARK A. GOLDSMITH  
　　　　　　　　　　　　　　　　　　　　　　United States District Judge